Caskie, Appellant, *v.* Philadelphia Rapid
Transit Company.

Argued January 6 and 19, 1939. Before KEPHART,
C. J., SCHAFFER, MAXEY, DREW, LINN, STERN and
BARNES, JJ.

34

*C. Brewster Rhoads,* of *Montgomery & McCracken,* for appellant.

*John V. Lovitt,* with him *Frederic L. Ballard,* of *Ballard, Spahr, Andrews & Ingersoll,* and *Knox Henderson,* for appellee.

OPINION BY MR. JUSTICE MAXEY, March 22, 1939:

The plaintiff, a member of the bars of the States of Pennsylvania and New York, brought an action in assumpsit against the Philadelphia Rapid Transit Company (hereafter called the P. R. T.) to recover $40,000 paid to that company by the International Railway Company of Buffalo, N. Y. (hereafter called the Buffalo Company). The action is not based on privity of contract, but is for money had and received by the P. R. T. by alleged fraud. The amended statement sets forth that the plaintiff had a contract of employment with the P. R. T. from 1919 to 1930, and that for the last four years of that period he was retained by the defendant as its general attorney "in charge of negligence and claims," for which services he was paid by the defendant. He averred that by verbal arrangement with T. E. Mitten, President of the P. R. T. (who, it was averred, had the authority so to agree), he was free to serve other clients than the defendant and to be com-

pensated by such other clients for such services. He averred that in 1922, through the chairman of its Board of Directors and its executive committee, T. E. Mitten, (he being the same T. E. Mitten who was President of P. R. T.), the Buffalo Company retained him (the plaintiff) as its attorney to direct and supervise the prosecution of "actions in relation to illegal motor vehicle competition," and the prosecution of "striking and dissatisfied employees, for dynamiting outrages committed on the property and passengers of the Buffalo Company." Plaintiff averred he was retained "as its general attorney, by verbal agreement" and that he "should be reasonably compensated . . . for his legal services" by the Buffalo Company and that the latter company "had full knowledge that plaintiff was also employed" by the P. R. T. and that the employment with the Buffalo Company was undertaken "with the knowledge and consent" of the P. R. T. and that by verbal agreement with T. E. Mitten, President of P. R. T., the fees paid to plaintiff by P. R. T. "were not to cover and did not include his legal services to the" Buffalo Company and that he was "free to charge the latter" for such services as he might render as attorney-at-law." He set forth the nature of his services to the Buffalo Company in the sum of $200,000 for his legal services to it and within one month thereafter, the Buffalo Company "severed its connections with plaintiff."

Plaintiff then sets forth as his cause of action what we have heretofore reviewed and summarized in *Caskie, Aplnt., v. P. R. T.,* 321 Pa. 157, 159, 184 A. 17 (which arose from a judgment in favor of defendant on an affidavit of defense raising questions of law), as follows: "Defendant and International Railway Company with knowledge of those facts, fraudulently conspired (by representing that defendant and not plaintiff was entitled to the compensation payable for the services) to refuse to pay plaintiff's claim, and, instead, to pay to defendant the sum of $40,000 as compensation for the

services rendered by plaintiff, thereby unjustly enriching itself in that amount in circumstances in which the law implied a promise on defendant's part to pay said sum to plaintiff. . . . In holding that no cause of action was pleaded, the learned court below said: 'The difficulty with plaintiff's case is that defendant does not have in its hands money belonging to plaintiff, but money which belongs either to defendant or to International Railway Company. Plaintiff's right of action against the International Railway Company continues unimpaired.'" We held: "The judgment [on the pleadings] must be reversed. . . . In *Angle v. C., St. P., etc., Ry. Co.*, 151 U. S. 1, 13, BREWER, J., said: 'It has been repeatedly held that, if one maliciously interferes in a contract between two parties, and induces one of them to break that contract to the injury of the other, the party injured can maintain an action against the wrongdoer.' . . . For such interference an action in tort lies. Or, the injured party may elect to redress the wrong in assumpsit for restitution of what the tort-feasor received." We ruled that defendant's "speaking demurrer" was "bad" and declared that "defense on the merits is not before us."

After trial, a verdict was rendered for the plaintiff in the sum of $58,333, but upon motion the court entered judgment for the defendant n. o. v. This appeal followed.

Plaintiff served the Buffalo Company seven years, during which period he received no compensation from it but did receive $25,000 annually from the P. R. T. He collected nothing from the Buffalo Company for his services. In the early days of his service to that company, the latter paid the P. R. T. $4,000 on account of Caskie's services. Caskie testified: "When that was brought to my attention [in 1923], I told the Chief Clerk that my salary was not to be billed in that way. . . . I told them I would speak to Mr. Mitten about it. . . . After I spoke to Mr. Mitten the billing was stopped and

it was never billed again during the remaining 5 or 6 years that I was in Buffalo." He also testified that in 1924 he told Mr. Mitten that he "would like to have something on account of my services up to date on the jitneys and the dynamiting and on the other things and he said he would have Mr. Tully and Mr. Weber come down from Buffalo and that we would confer upon the figure that I should receive for my services up to that time." From the testimony it is clear that before 1929 neither the plaintiff nor the defendant *pressed* any claim against the Buffalo Company for Caskie's services to the latter. Plaintiff waited over seven years before asserting his claim against the Buffalo Company in the manner one would reasonably expect such a claim to be asserted. P. R. T. waited one month longer. The death of Mr. Mitten on October 1, 1929, brought things to a head. On December 4, 1929, Caskie presented his bill to the Buffalo Company, and on January 3, 1930, P. R. T. presented its bill to the same company for Caskie's time, and 19 days later received the Buffalo Company's check for $40,000.

In its opinion entering judgment for the defendant, the court below conceded that in view of the verdict of the jury, it was established that the plaintiff rendered valuable services to the Buffalo Company, for which it agreed to pay him, quantum valebant, and that while the contract "was not shown to have been made expressly . . . there was ample evidence of its ratification." The court also said that it must accept "as fact" that the plaintiff was not a party to any arrangement between the two companies involved in the case as to any "lending agreement" between them in respect to their employees, and that if there was such an agreement, the plaintiff as an attorney-at-law was not intended to be included in it and was not included.

The court below found that "the question raised is very simple: Did the two companies fraudulently conspire, by representing that defendant, P. R. T. and not

plaintiff was entitled to compensation [by the Buffalo Company] to refuse to pay defendant the sum of $40,000 as compensation for the services rendered by plaintiff?" The court answered the question thus posed by saying in substance: If there was a contract between plaintiff and the Buffalo Company, it was binding upon the latter, and likewise if there was a contract between the latter and P. R. T. for plaintiff's services, it would be no interference with the first contract. The two companies could make what contracts they pleased. P. R. T.'s insistence on its rights, under the arrangement between the two companies could not harm plaintiff or raise a defense for the Buffalo Company in a suit by the plaintiff against the Buffalo Company. What P. R. T. did was to make a claim against the Buffalo Company for a proportionate share of the salary it paid plaintiff while he was away from Philadelphia. In other words, the P. R. T. took this position with the Buffalo Company: we paid this attorney of ours $25,000 a year and we were entitled to his services; nevertheless, we loaned him to you for a part of the period covered by his contract and for this we demand reimbursement. The Buffalo Company acknowledged P. R. T.'s claim and complied with its demand. The court below found no evidence of fraud—no evidence that the two companies had *conspired* (1) to interfere with plaintiff's contract relations with the Buffalo Company, (2) to refuse to pay plaintiff's claim, and (3) instead to pay defendant $40,000.

In this there was no error. We find in this record no direct evidence supporting the serious allegations on which plaintiff's claim against P. R. T. is based and no evidence from which proof supporting such allegations can be inferred. Only substantial proof can make out a case of tort as charged in plaintiff's statement. Conjecture here as elsewhere in the administration of justice will not suffice. The averment is that defendant's actions in entering into a purported lending contract with

the Buffalo Company in respect to his services and in collecting $40,000 from the Buffalo Company for plaintiff's services constituted "a scheme on its part to defraud or delay plaintiff in collecting his just fees from International Railway Company in which conspiracy, the International Railway Company joined the defendant." The gravamen of plaintiff's claim is that these two companies "conspired to defraud plaintiff."

In the opinion handed down when this case was last before us, the case of *Angle v. C., St. P., etc., Ry. Co.,* 151 U. S. 1, 13, was cited in support of the proposition that for malicious interference in a contract an action lies against the wrongdoer. The report of that case shows that the interference was accomplished by false representations and bribery. The charge of malice was thus supported. In *Temperton v. Russell,* 1 Q. B. 715, also cited in the opinion filed heretofore in this case, the means used to induce persons to break their contracts consisted of threats to withhold workmen. It was said in that case by the court that "to maintain the cause of action sued on, there must be evidence that the defendant, with knowledge of the existence of a contract, had induced and succeeded in inducing one of the contracting parties to break his contract to the injury of the other contracting party, and there must be evidence that the intention of the inducer was by such breach to do harm to the other contracting party, or, to use Lord HANNEN's words in *Mogul S. S. Co. v. MacGregor, Gow & Co.* (1892), A. C. 25, at p. 60, that the 'real object was to injure the individual.' " In *Erdman v. Mitchell,* 207 Pa. 79, this court held that an agreement by a number of persons that they will by threats and strikes deprive a mechanic of the right to work for others merely because he does not choose to join a particular union, is a conspiracy to commit an unlawful act. In *Bausbach v. Reiff,* 244 Pa. 559, we held that the combination to deprive a mechanic or workman of work by force, threats or intimidation of any kind, is a conspiracy.

In the case of *Bowen v. Hall,* 6 Q. B. 333, it was held that an action lies against a third person who maliciously induces another to break his contract of exclusive personal service with an employer which thereby would naturally cause, and did cause, an injury to such employer. In that case the court said: "The act of the defendants was done . . . from a wrong motive, and would therefore justify a finding that it was done in that sense maliciously." In *Van Horn v. Van Horn,* 52 N. J. Law 284, 20 A. 485, the Supreme Court of New Jersey held that an action will lie for a combination or conspiracy, by fraudulent and malicious acts, to drive a trader out of business, resulting in damages, and that the gravamen in a civil action is not the conspiracy, but the malice; the former is matter of aggravation or inducement only, in the pleading and evidence. The following statement appears in the opinion in that case: "We have not presented for determination in this pleading the vexed question whether an action will lie against a third person for the malicious procurement of the breach of a contract, if by such procurement damage was intended to result and did result to the plaintiff. . . . The difficulties in such cases disappear, or are greatly reduced, when the cause of action is considered as belonging to the class in which malice, in the sense of actual ill will, is a necessary element. . . . The party who breaks the contract, for whatever cause, whether by procurement of others or of his own volition, is primarily responsible to the other party; and the procurer, it would seem, can only be held responsible for the breach, where there is malice shown to the sufferer, giving a distinct cause of action for the malice which caused the breach of the contract resulting in damages to him."

Applying these principles to the case at bar, the plaintiff, in order to support his action against the defendant company, is obliged to prove malice. The Buffalo Company was *primarily* responsible to plaintiff and nothing that the P. R. T. did could, in any way, serve as a defense

to plaintiff's claim *against the Buffalo Company.* If the Buffalo Company paid the wrong claimant, to wit, the P. R. T., it and not the plaintiff would be the sufferer. However, in addition to plaintiff's claim against the Buffalo Company, he could, of course, bring an action against the defendant company for malicious interference with his contract, as he did. This action failed for want of proof. From all that appears in this record, both the P. R. T. and the plaintiff acted in equally good faith in pressing their respective claims against the Buffalo Company. The P. R. T. apparently felt that it merely lent its employee, the plaintiff, to that company; the plaintiff felt that he was his "own man" and that he worked for that company. The dilatoriness of both plaintiff and the P. R. T. in pursuing their claims against the Buffalo Company has been noted, but the dilatoriness of the plaintiff is more significant *against him* than the dilatoriness of the P. R. T. is *against it.* If the plaintiff was acting as his "own man" in serving the Buffalo Company, it is seemingly inexplicable that he would wait over seven years to press his claim. In view of the fact that T. E. Mitten through "Mitten Management, Inc.," was the actual executive head of *both* the Buffalo Company and the P. R. T., it can be readily understood why the P. R. T., did not press its claim against the Buffalo Company. It may well have been that the Buffalo Company was not in such financial condition at that time as to invite a pressing of the claim, or it might be that through some conception of fiscal policy, he who was executive head of both companies, thought it best not to present the claim of one company against the other at that time. No such argument however can be made in respect to the dilatoriness of the plaintiff. It is most unusual for a lawyer who renders valuable professional service, as the lawyer-plaintiff in this case claims he did, to wait over seven years before demanding compensation. The facts of the case, instead of supporting plaintiff's allegation of

*malice* against the defendant P. R. T. Company, negatives any such claim.

In *Bitterman v. Louisville & Nashville R. R.*, 207 U. S. 205, the United States Supreme Court, in discussing an actionable wrong by one who maliciously interferes in a contract between two parties and induces one of them to break it to the injury of the other, referred to the necessary ingredient of malice as "the wanton disregard of the rights" of the other party. In the case at bar, we cannot find support for the theory that when the P. R. T. persuaded the Buffalo Company to pay *it* a claim for services over seven years after plaintiff had performed some of these services and had made practically no effort to collect for them, that the P. R. T. was showing "a wanton disregard" of plaintiff's rights. When anyone seeks to enforce what he regards as his own rights, he cannot be held guilty of a wanton disregard of the rights of others. It cannot be said in this case that the P. R. T., in making the claim it did against the Buffalo Company, was not acting under at least "the color of right." Having paid the plaintiff annually $25,000 for his services, it might well have held the opinion that when plaintiff rendered certain services to the Buffalo Company, whose executive head was the identical individual who was the head of P. R. T., he rendered those services on P. R. T.'s time. We repeat that it is significant that while plaintiff collected his annual salary with commendable regularity from the P. R. T., he waited over seven years—and until after the death of the man who presumably knew most about it, T. E. Mitten—to make and *press* his claim against the P. R. T.

While malice is a quality which must be proved by the circumstances attendant upon the act it motivates, the circumstances must be such as to make the presence of malice a natural and reasonable inference. In other classes of cases in which proof of malice is essential, this court has said that it "is implied from the outrageous circumstances of the act." Malice has been judicially

described as "the spirit of evil which sometimes grips individuals and nations. It is the venomous spirit that motivates those who delight in doing harm to others." The record under review reveals nothing to support the allegation that in making its claim on the Buffalo Company, the P. R. T. was motivated by any such spirit toward this plaintiff as could be judicially characterized as the spirit of evil, i. e., of venom and malice. On the contrary, it appeared to the court below and it so appears to us that P. R. T. honestly thought it had a just claim against the Buffalo Company and successfully pressed it. Its collection of its claim against the Buffalo Company had not the slightest legal effect on any meritorious claim plaintiff might have against the Buffalo Company.* If C induces B to pay C a bill which is really not owing to C but is owing to A, the latter can proceed against B exactly as though B had not paid C. We cannot accept the view expressed in appellant's brief that "Defendant's conduct placed I. R. C. [the Buffalo Company] in a position where it could and did defend against plaintiff's claim by showing that the services were already paid for." Paying the *wrong* claimant for services has no legal effect whatever on the rightful claimant's claim for the same services. Appellant says further: "It [defendant's conduct] has created a colorful ground for I. R. C.'s continued refusal to pay plain-

---

* In fact, plaintiff brought suit in New York State, in January, 1930, against the Buffalo Company. He recovered a judgment in the sum of $80,000, which the Appellate Division reduced to $55,000. The Court of Appeals reversed the judgment and granted a new trial on January 17, 1933 *(Caskie v. International Ry. Co., 261 N. Y. 47)*. The highest court in New York decided that T. E. Mitten had no authority to bind the Buffalo Company with the contract he is alleged to have made with the plaintiff involving compensation from that company. The new trial was granted to give plaintiff an opportunity to present evidence of ratification of the alleged contract between him and the Buffalo Company. There have been no further proceedings in this case in New York State.

tiff and has created an additional defense which plaintiff must meet in order to recover against I. R. C." Whether the "ground" referred to is "colorful" or otherwise, it is not one on which the Buffalo Company can *legally* stand against plaintiff's claim and is not a *legal* "additional defense" which plaintiff must meet. If the payment to the latter for plaintiff's services was a mistake, the Buffalo Company alone must suffer. The payment to P. R. T. does not have the slightest effect on the *facts* of the legal situation as between the plaintiff and the Buffalo Company.

After reading this record one reaches the conclusion that the plaintiff was employed in *practical effect* by T. E. Mitten, who was in *actuality* "Mitten Management, Inc." Mr. Mitten evidently had great confidence in Mr. Caskie's ability and efficiency and used him at will in the service of the Buffalo Company and the P. R. T., both of which were dominated by Mr. Mitten. For Caskie's services, Mr. Mitten arranged that he should receive an annual salary of $25,000 *from the P. R. T.* It had been increased from $9,000 a year, the salary paid Caskie when he was the head of P. R. T.'s claim department. Mr. Caskie had also been treated quite handsomely otherwise by Mr. Mitten. He had received from the P. R. T. a 10% wage dividend, $15,000 in special bonuses, and from Mr. Mitten directly, 600 shares of the stock of the Buffalo Company. He was a member of the P. R. T. Co-operative Association in 1919 and of the P. R. T. Wage Fund from its inception in 1922. Membership in these organizations was limited to employees "whose sole occupation has to do with company duties and whose entire working time and wages are subject exclusively to the call and demand of the company." Plaintiff was entirely familiar with these organizations and testified that he assisted Mr. Mitten in their formation. He signed the application for membership as an employee and as head of the Claims Department he certified that he was eligible for membership. He remained

a member of these organizations over the entire period covered by this action.

As long as Mr. Mitten lived Mr. Caskie apparently thought himself well provided for and made no real effort to collect anything from the Buffalo Company for his services. After Mr. Mitten's death he apparently found the situation in which he was placed not so favorable to himself and he then, for the first time, made and pressed his claim against the Buffalo Company. A month later P. R. T. presented its bill to the Buffalo Company for the same services. That this latter bill was presented by P. R. T. and promptly paid to it, falls far short of sustaining the allegation that defendant maliciously and tortiously interfered with plaintiff's "contract" with the Buffalo Company.

The judgment is affirmed.